David J. Heaslett, Esq. (CA Bar No. 061463)
#6 Graeagle Village Center
P.O. Box 340
Graeagle, CA 96103
Telephone: (530) 836-4625

Attorney for Debtor

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

SANTA ROSA DIVISION

| | |
|---|---|
| In re:<br><br>Palm Drive Health Care District,<br><br>　　　　　　Debtor | Case No.: 07-10388-AJ9<br><br>Chapter 9 |

**DISCLOSURE STATEMENT FOR
SECOND AMENDED PLAN OF ADJUSTMENT**

**1.     INTRODUCTION**

　　　　Palm Drive Health Care District (the "Debtor" or the "District") filed this Chapter 9 case on April 5, 2007.  This Disclosure Statement contains a detailed discussion of the accompanying *Second Amended Plan of Adjustment Dated April 30, 2009* (the "Plan"), and its implementation and is intended to comply with the requirements of 11 U.S.C. §§ 1125 and 1126.  The Plan is a legal document and, upon confirmation, will become binding upon all parties in interest.

　　　　The District along with its general legal counsel, bankruptcy counsel and counsel for the Official Unsecured Creditors Committee ("Committee") have jointly formulated the Plan that, given the financial health of the Palm Drive Hospital, provides a meaningful distribution to creditors while still allowing the hospital to remain in operation.  Due to the time constraints required to exit bankruptcy and obtain adequate capital to remain in operation, the Plan represents the District's best offer to creditors.  The Committee supports the Plan and urges creditors to vote to <u>accept</u> the Plan. The District's Board of Directors understands the support its creditors have provided to the hospital and believes this offer is reflective of that appreciation and generous both to large and small creditors given the hospital's financial condition.

The Plan requires, as a condition to its effectiveness and the District's emergence from bankruptcy, that the District secure outside funds through a municipal financing arrangement. It is believed that the only funding source currently available to the District is a sale of tax-exempt Certificates of Participation ("COPs") through the Northern California Health Care Authority ( the "Authority"). Due to the covenants under certain existing bond obligations of the District, the District is unable to incur any senior, parity or other long-term debt COPs during the pendency of its Chapter 9 bankruptcy case. The District has retained Sutter Securities Incorporated ("Sutter") as its investment banker in preparation for the issuance of approximately $10 to $12 million of COPs, under which the District will enter into a lease and leaseback of its facilities with the Authority and its obligation under the leaseback will be on a parity with its existing Bonds (as defined below). The District will secure its obligation to make lease payments under the lease agreement in an amount equal to the debt service on the COPs, by a parity pledge of its voter-approved parcel tax revenues. Through Sutter's work with McDonnell Investment Management, LLC, a potential purchaser for the COPs has been identified. The potential purchaser is UnitedHealth Group Incorporated ("UnitedHealth"). UnitedHealth is interested in purchasing the COPs under the auspices of the UnitedHealth Group California Health Care Investment Program (the "Program"). UnitedHealth has purchased and is in the process of proposing to purchase bonds from the North Sonoma County (Healdsburg) Hospital District and the Sonoma Valley Health Care District. The Program was formed as a result of the acquisition of PacifiCare Health Systems and its affiliated companies by UnitedHealth. The purpose of the Program is to provide access to capital through a dedicated investment portfolio for health care entities providing services to currently underserved, low-income and underinsured communities throughout California. Thus, UnitedHealth is a ready, willing and able purchaser of the COPs. Given today's market conditions, there appears to be no other interested purchasers of the COPs.

The sale of the COPs to UnitedHealth is contingent and conditioned upon (a) the confirmation of the Plan and the discharge of the Debtor, (b) the receipt of an "investment grade" rating for the COPs from Standard & Poor's, and (c) the terms and conditions of underwriting for the

///

COPs by Sutter. Correspondingly, the effectiveness of the Plan is itself contingent and conditioned upon the sale and closing of the COPs. Exhibit C1 describes the estimated sources and uses of the proceeds of the COPs and further identifies the capital equipment projects for FYE 2010 to support the District's strategic plan (attached hereto as Exhibit C).

If the Plan is not accepted in a timely fashion, the District may be forced to drastically reduce the level of services at the hospital. The District therefore believes that it is in the best interests of all parties to approve this Plan in a timely fashion so that the District can obtain the capital needed to make payments to creditors, pay off other debt, and complete needed equipment and building upgrades.

The Plan provides more specific information related to creditor payments.

## 2. GENERAL BACKGROUND

Sebastopol is in West Sonoma County, in suburban northern California. The District, with a population of approximately 60,000, includes the communities of Bodega Bay, Bodega, Salmon Creek, Carmet, Jenner, Duncans Mills, Guerneville, Occidental, Freestone, Rio Nido, Monte Rio, Guernewood Park, Summerhome, Mirabel Park, Forestville and Graton.

Palm Drive Hospital (the Hospital) was purchased by the West Sonoma County community from Columbia HCA in 1999. The District was formed and has been in operation since 2000.

The District is a local hospital District organized under the provisions of Section 32,000, et seq., of the California Health and Safety Code. It operates a small hospital with 37 beds, and an emergency room, with outpatient surgery, laboratory, radiological, and physical therapy services in Sebastopol, California. The District ceased operating its "Distinct Part" skilled nursing facility on February 29, 2008.

The District is governed by a five-member Board of Directors elected by the registered voters in the District. Day-to-day operations are conducted by the District's professional staff. The fact that the Board of Directors is elected by the public causes both problems and creates opportunities that are generally associated with local government entities. Its governing body and senior staff undergo much closer public scrutiny and must devote more time to public affairs than would be the case if it were a private corporation. On the other hand, as a local public entity, the local residents

tend to be supportive of the District and recognize that it provides needed health care services that would probably not be provided by a private organization.

Medical staff for the hospital includes an independent group of physicians and licensed healthcare professionals. The District employs 286 people, working the equivalent of 152 full time employees. The District is one of the major employers in the Sebastopol and West Sonoma County area. The District averages 630 emergency department visits per month and in January 2009 had 372 acute care patient days, an average of 12 acute care patients per day.

Like many small hospital Districts, the District has struggled financially for years, showing a net operating loss of $11,600,000.00 in the last 7 years, after parcel tax revenue support. The voters in the District approved a Special Parcel Tax in 2005 ("Parcel Tax") which funded the District's Series 2005 Parcel Tax Bonds (the "Bonds"). The Parcel Tax contributes approximately $3.6 million annually to hospital revenue. The tax payments received, in excess of the semi-annual principal and interest payments on the Bonds, have been used for operations.

Like most small suburban hospitals in the United States, the District faces immense financial pressures. Mandatory payment reductions by government and insurance programs, and increased regulatory requirements have substantially changed the hospital operating environment.

The community requires emergency, urgent and acute care services, as well as long term acute care and skilled nursing services. To provide these services, the District must actively participate in developing and maintaining a panel of primary care and specialty physicians within the District and maintain and upgrade its medical, imaging, laboratory equipment, and physical plant.

Under Federal law a hospital is required to treat any person who is presented at the Emergency Room without regard to the patient's ability to pay for services. The District absorbs the costs of medical care for approximately 5% of its un- or under-insured residents.

The Medi-Cal and Medicare insurance programs, representing 60% of total revenue, are highly regulated and controlled, with reimbursement regulations frequently modified by the State legislature, the State Department of Health Services, the U.S. Department of Health and Human Services and Congress. In addition, most private insurers base their payment schedules on a

///

percentage of Medicare payments. Cost cutting by Medi-Cal and Medicare immediately impacts Hospital revenue.

In preparing the Plan, the Board of Directors has considered the costs of: 1) deferred maintenance, 2) replacing aged and out-dated equipment, 3) the need to pay competitive wages to employees, 4) maintaining a sufficient cash reserve, and 5) the costs of technology upgrades. These improvements will require additional municipal financing.

Senior management has experienced a large turn over since the summer of 2006. From March 26, 2007 until December 31, 2007, the Chief Executive Officer position was held by Jim Sato. On January 1, 2008, Lori Austin RN, CCRN, EMT-P, the Hospital's COO, took the position of Interim Chief Executive Officer. In May of 2008, Jim Russell became the District's CEO/CFO, and in February 2009 Rochelle Winter became the Director of Finance.

The District has received substantial community support in the form of unsecured short term funds from Stephen and Shawndra Simpson, Dan Smith, Joan Marler, Frank and Kathleen Mayhew, and the Community Foundation of Sonoma County. Without this post-petition community support the District would have been forced to close the Hospital, a substantial loss to the residents of, and visitors to, the District. As of February 29, 2008, the District has an administrative obligation to (i) Mr. Smith and Ms. Marler, and (ii) the Community Foundation of Sonoma County in the amounts of $1,000,000 and $500,000, respectively.

Recently, on August 19, 2008, the Court approved a loan to the District from the County of Sonoma, secured by a junior lien on the District's general revenues, in the amount of $2,905,000, for operations pending the implementation of new municipal financing and the Plan.

Maintenance of health services to the community must be the primary goal of the Board of the District and is essential to the residents, visitors and travelers in the area. The continued operation of the heath care services are necessary to the community, in part, because of the geographic isolation of a large area of the District and the need to provide inpatient acute care and outpatient laboratory and radiological services to the total community. The critical nature of the need for heath care services requires the Board to place a high priority on the continued financial stability of the District.

The District's strategic plan includes increasing revenue through programs that attract more patients to the hospital, decreasing expenses for purchased services and professional fees and upgrading and replacing the medical equipment necessary to provide for the standard level of care for its patients. Exhibit C sets forth the District's strategic plan. Exhibit C1 describes the estimated sources and uses of the proceeds of the COPs and further identifies the capital equipment projects for FYE 2010 to support the District's strategic plan.

3. **DECISION TO FILE FOR PROTECTION UNDER CHAPTER 9**

In early Spring of 2007 the District was faced with a serious cash shortfall. The Parcel Tax receipts of approximately $1 million were expected in mid-April. The District Board recognized that the receipt of the Parcel Tax proceeds was but a stop-gap solution and that a thorough reorganization of the District's finances was required. As a result, the Board elected to file for protection under Chapter 9 to allow time to prepare a strategic Plan for the future that would provide the necessary level of healthcare services to the community within a "cash flow positive" budget.

Immediately after the filing, the District entered into a Compromise and Forbearance Agreement with the Bank of New York, currently Wells Fargo Bank, in its capacity as the Indenture Trustee of the Bonds. The Bank of New York agreed not to "accelerate" the bonds and to release the excess proceeds to the District. Without this agreement, the District would not have been able to cover monthly operating expenses, including payroll and payroll taxes.

Chapter 9 of the Bankruptcy Code was established to allow bankruptcy protection and reorganization opportunities under the Bankruptcy Code for local government entities. In many respects, it is similar to the more familiar provisions of Chapter 11, although there is only minimal Court supervision of the affairs of a Chapter 9 debtor, a governmental entity.

4. **DESCRIPTION OF CURRENT FINANCIAL STATUS AND PROJECTIONS**

Exhibit A is a summary of the District's Financial Statement for the fiscal year through June 30, 2008. Exhibit B is the District's projected Income and Expense Statement (Cash Basis) through calendar year 2012.

Hospital finances and management are extremely complicated and many variables must be considered in making a small hospital self supporting. Among these factors is the interplay between

the state and federal health financing programs and reductions in reimbursement which have been experienced in the last several years. The administration has attempted to take all the variables into account in the projections and to model the District into a form which maximizes the return on its assets and continues to provide the necessary medical services to the area residents.

The administration and Board of the District believe that with the current trends the District will be able to meet its ongoing obligations after the confirmation of the proposed Plan. The Board has taken into consideration the current changes in Medi-Cal and supplemental reimbursement for Medi-Cal from Federal sources, tax revenues, reasonable increases for inflation and improved use of the facility. The cash flow projections used by the Board in defining its Plan also examined and considered expenses for deferred maintenance, and minimal replacement and reconstruction of the hospital facility, and upgrading or replacement of aged and outdated medical equipment. Significant upgrading and replacements will not occur without additional financing.

The following factors are believed by the hospital administration, the District's Board, staff and counsel to support its position that this Plan is feasible, will be completed successfully and should be confirmed.

- Starting after the filing of the Chapter 9 Case and continuing thereafter, the District instituted broad expense reduction measures.

- Revenue has been enhanced by increased acute care utilization, in large part as a result of increased utilization by local physicians, marketing improvements, and significant rate increases from all private insurers.

- The District has professional administration and consultants, with experience in the field of small hospital management, that have established internal controls, and the Board is actively recruiting permanent senior staff.

- Appropriate accounting and management information systems were put into place and now provide accurate and adequate information from which appropriate day to day management decisions can be made.

- The District reopened the ICU on July 6, 2007. Dr. James Gude, an Intensive Care Specialist from Sutter Medical Center of Santa Rosa, is the medical director for the ICU. He is augmented by several other physician specialists in ICU medicine and by the latest, state-of-the-art robotics. This new robotic system allows a physician at the District to receive real-time, specialist consultation from a physician in Santa Rosa or in San Francisco. The off-site specialist is able to "see" the patient, to read radiological and lab reports, and to talk to the patient and physician in real-time.

///

## 5. MEANS OF IMPLEMENTATION OF THE PLAN

a. <u>Issuance of COPs.</u> Upon the consummation of the sale of the COPs, the District will cause to be deposited sufficient funds into the Plan Fund to pay outstanding administrative expense claims, plan expenses and the Allowed Claims of creditors in Classes C1, C2 and C3 of the Plan. The amount to be deposited by the District into the Plan Fund from the proceeds of the COPs shall be determined by the District and the Committee at or prior to the confirmation hearing.

The District will satisfy its obligations under the Plan and finance a portion of its past working capital expenses and operating losses and certain of its future long-term capital and operating needs through the sale of the COPs. The COPs will represent the direct, undivided fractional interests of the registered owners thereof (the "Owners") in lease payments (the "Lease Payments") to be made by the District for the lease/leaseback of its existing hospital facilities (the "Facilities") pursuant to a lease agreement ("Lease Agreement") by and between the District and the Northern California Health Care Authority (the "Authority").

The COPs will be executed and delivered pursuant to a trust agreement, by and among the District, the Authority and its Trustee. Pursuant to a Facilities Lease, by and between the District and the Authority, the District will lease the Facilities to the Authority for a lump sum payment equal to the principal amount of the COPs (less closing costs and other items), and will then lease the facilities back from the Authority pursuant to the Lease Agreement. The District's obligation to pay rent to the Authority under the Lease Agreement will be equal to the debt service payments to be made from time to time on the COPs. The District will secure its obligations to make Lease Payments under the Lease Agreement with a pledge of the receipts from the Parcel Tax, which pledge will be on parity basis with the Bonds. The District will also irrevocably agree that the Parcel Tax Revenues described in the COPs are "special revenues" as defined in 11 U.S.C § 902(2).

Pursuant to an Assignment Agreement, by and between the Authority and the Trustee (the "Assignment Agreement"), the Authority will assign to the Trustee, for the benefit of the Owners, its rights under the Lease Agreement and under the pledge of the Parcel Tax from the District, including its right to receive the Lease Payments and its right to enforce amounts payable from the Parcel Tax upon default. The COPs are intended to provide tax-exempt income to the Owners, resulting in a

lower borrowing cost to the District than if it was required to complete the financing on a conventional, taxable basis.

The District and the Unsecured Creditors' Committee have agreed to earmark and set-aside at least the following proceeds from the sale of the COPs (in the Plan Fund) in order to satisfy the District's obligations under the Plan. These earmarked funds will not be used in operations and will only be used to repay pre-petition creditors holding allowed unsecured claims under the Plan. The District has agreed that the following restrictions on the use of COPs proceeds will be binding unless otherwise agreed by the Committee.

First, the District will cause to be set-aside an amount of approximately $225,000 for the payment of 75% of the allowed Class C1 claims within 30 days following the Effective Date of the Plan (or, if the claim is disputed, within 10 days after allowance). Class C1 includes all allowed claims under $10,000 or voluntarily reduced to $10,000 by election of a creditor. According to the claims filed against the District, it appears that there are 104 claims under $10,000 with a total face amount of approximately $267,000. Additionally, creditors may elect to reduce their claims to $10,000 (hence requiring an additional deposit to the Plan Fund of approximately $25,000).

Second, the District will cause to be set-aside an additional amount of approximately $1.6 million for the payment of Class C2 unsecured claims. This amount will be used to repay unsecured creditors as follows: 55% of the allowed amount of such claim within 30 days following the Effective Date of the Plan (or, if the claim is disputed, within 10 days after allowance). At present it appears that there are 52 claims over $10,000 with a total face amount of approximately $2.91 million. If additional claims are filed against the District, the District will cause to be set-aside additional funds in order to meet the foregoing distribution terms. Any funds not used to repay creditors may revert to the District for general purposes.

Last, the District will cause to be set-aside an amount of approximately $153,000 to satisfy the initial payment due to the holders of the Class C3 Claim. (The balance of the payments due to this creditor will be paid in twelve monthly installments, without interest, by the Reorganized District.) The Class C3 Claim is the Simpson Claim and represents a promissory note issued by the District on account of a $200,000 emergency bridge loan made by Stephen and Shawndra Simspon

in November 2006, shortly before the commencement of the District's Chapter 9 case. Ms. Simpson was a former administrator of the Palm Drive Hospital. The proceeds of the loan were used to meet the District's payroll obligations, among other critical debts, while it worked to restructure its operations in an attempt to avoid its Chapter 9 filing. The District has a long history of extensive and valuable community support and, in the exercise of its political and governmental powers, has determined that it is important to its continued operations to repay the loans made by volunteers and donors. Without this community compact in place, the District's efforts to raise funds and encourage local voluntarism and participation would, in the judgment of the District's directors, be jeopardized. As a result, the District has determined to classify the Simpson Claim separately and to repay such claim in full (albeit without the interest contemplated under the note and over a one-year period following confirmation).

The sale of the COPs will also provide funds to finance a portion of its past working capital expenses and to finance certain of its future long-term capital and operating needs.

The District has repaid the unsecured administrative loans from Exchange Bank and the California Health Facilities Financing Authority ("CHFFA"). The CHFFA loan was approved in July 2008 and was fully repaid when the District received the Medi-Cal arrears from the State of California.

The Board of Directors of the District, management, and counsel for the District believe that the proposed Plan represents the District's best good faith effort to balance its duty to pay its creditors with its duty to provide health care services to the community that the District was established to serve.

The Plan, described below, provides creditors an assured means of prompt payment of Allowed Claims, resolution of any disputed claim, and sufficient new financing for the District to provide the medical services in its jurisdiction. The Plan is in the best interests of creditors because it provides for a fair and equitable dividend to all creditors of the same class. The Plan is feasible because it is based upon the issuance of new municipal financing which will provide the District a stable financial base.

///

b. <u>Treatment of Lenschmidt Claims.</u> All claims filed by Steven P. Lenschmidt, LLC, Fred L. Lenschmidt Living Trust, or other persons or entities affiliated with such parties ("Lenschmidt Claims"), against the Debtor have been acquired by and transferred to the Palm Drive Health Care Foundation, a California nonprofit mutual benefit corporation (the "Foundation") and are held by such foundation for the purposes of voting and distribution under the Plan. A portion of the Lenschmidt Claims in the amount of approximately $55,000 was filed on account of post-petition rent. Unless the Foundation agrees to a different treatment or amount of such portion of the claims, and except as may otherwise be determined by the Bankruptcy Court, such portion of the claims shall be paid as an administrative expense at the time set forth in Article 7 of the Plan. All other Lenschmidt Claims now held by the Foundation shall be treated as unsecured claims under the Plan and classified in Class C2 of the Plan. Any liens granted or conveyed as security for any Lenschmidt Claims shall be deemed terminated, withdrawn and released against any property of the District.

**6. SUMMARY OF PLAN**

The Claims against the District, have been divided into classes. Each class is composed of one or more creditors whose claims are of the same type, and who will receive the same treatment as other members of the same class. A list of classes, a description of the members of each class, and the proposed treatment of each class is set forth below. The description of each class also indicates if that class is impaired or unimpaired within the meaning of 11 U.S.C. Sec. 1124.

The District plans to implement the lease of its facilities to the Authority and the leaseback thereof in connection with the sale of the COPs described above to provide sufficient cash to make the payments to creditors as called for in the Plan. The effectiveness of the Plan is conditioned and contingent upon the successful sale of the COPs. If the COPs sale has not been consummated by August 1, 2009, the Plan shall be deemed withdrawn by the District, unless the foregoing deadline is extended by mutual agreement between the Committee and the District.

a. <u>ASSUMPTION OF EXECUTORY CONTRACTS AND LEASES.</u> All unexpired leases or executory contracts of the Debtor that are not specifically rejected under the Plan or by a separate motion to reject shall be deemed assumed by the Reorganized District on the Effective Date

(including any modifications, amendments or supplements made to such agreements). For the avoidance of doubt, the Debtor hereby assumes its Medicare contracts as of the Effective Date of the Plan. The Reorganized District shall also assume the *Information Systems Agreement Document # 03538* with Spectron Corporation as of the Effective Date of the Plan. The Spectron Corporation proof of claim filed in the Chapter 9 case shall be deemed amended to assert a claim for a Cure Payment under such agreement in the amount of $15,211.72, which shall be paid as an administrative expense at the time set forth in Article 7 of the Plan.

The District does not believe that there are any Cure Payments due under any other executory contracts or unexpired leases assumed by the Reorganized District under the Plan. Any person that fails to object to the assumption by the Reorganized District of an executory contract or unexpired lease on or prior to the date set by the Bankruptcy Court for filing objections to confirmation of the Plan shall be forever barred from (i) asserting any other, additional or different amount on account of such obligation against the Reorganized District, and (ii) sharing in any other, additional or different distribution under the Plan on account of such obligation. If and to the extent any Cure Payment obligation is determined and allowed by the Court, the Reorganized District shall satisfy such Cure Payment by making a cash payment in the manner provided for administrative expenses under Article 7 of the Plan.

b.  ADMINISTRATIVE EXPENSES. Notice and opportunity for hearing upon allowance of administrative claims will not be given unless the administrative claim is disputed by the Debtor. Administrative expenses allowed under Section 507(A)(2) of the Bankruptcy Code, which may not have been paid on an ongoing basis during the Chapter 9 case, will be paid thirty days after the Effective Date of the Plan. At present, the estimated total of unpaid administrative expenses and/or plan expenses is approximately $234,623.96, comprised of outstanding fees and expenses for counsel for the Official Committee of Unsecured Creditors and the Lenschmidt administrative expense (described above), now held by the Foundation. The District shall also pay allowed Section 503(b)(9) expenses. As of March 31, 2009, the total amount of fees for services rendered and costs incurred by counsel for the Official Committee of Unsecured Creditors was $199,623.96 (the District has made a partial payment of $20,000 on this amount). The estimated

fees and expenses for counsel for Wells Fargo Bank, N.A., as indenture trustee for the Bonds, are approximately $125,000. All such amounts have been fully disclosed to the District, and the District believes they are reasonable.

   c.   CLASSIFIED CLAIMS.

   1.   <u>Class S1.</u> Class S1 consists of the Allowed Secured Claim of the holders of record of the Bonds. The Bonds are secured by a first priority lien on the annual Parcel Tax revenues collected by the County of Sonoma, more fully described in the Trust Indenture for the Bonds and other documents. The Allowed Secured Claim of approximately $9,290,000 shall include all principal, interest, costs, trustee's fees and expenses and other items of indebtedness of whatever form due under the Trust Indenture and the other documents and instruments related to the Bonds. Class S1 is unimpaired. The District and Wells Fargo Bank., N.A., as indenture trustee for the Bonds, will execute an amendment to the Trust Indenture, that is mutually satisfactory to the parties, to clarify certain provisions therein pertinent to the Bonds and the COPs.

   2.   <u>Class S2.</u> Class S2 consists of the fully secured Allowed Secured Claim of the bondholders of record of the 2000 GO Bonds secured by a first priority lien on the annual *ad valorem* property tax revenues collected by the County of Sonoma, more fully described in the trust indenture for such bonds and other documents, and insured by AMBAC Assurance Corp. The fully secured Allowed Secured Claim of $5,600,000 shall include all principal, interest, costs and other items of indebtedness of whatever form due under the Indenture Agreement, and the other documents and any related instrument. Class S2 is unimpaired.

   3.   <u>Class S3.</u> Class S3 consists of the Allowed Secured Claim of the holder of the Sonoma County Note. The maturity date of the Sonoma County Note will be deemed extended to the 15th calendar day following the Effective Date, and all other terms and conditions of such note shall remain unaffected. On or before the 15th calendar day following the Effective Date, the Reorganized District shall select one of the following alternative treatments for the Sonoma County Note: (a) the outstanding amount due under the Sonoma County Note, including all accrued interest, will be repaid by the Reorganized District in full, in cash (from the proceeds of the Recovery Financing) on the 15th calendar day following the Effective Date, in full and final satisfaction of such

claim, or (b) with the consent of the holder of the Sonoma County Note, the maturity date of the Sonoma County Note will be deemed further extended to June 30, 2010. Upon repayment, the holder of the Sonoma County Note will release and terminate all liens and security interests on the general revenues of the District, including excess Parcel Tax Revenues. Class S3 is impaired.

4. <u>Class C1.</u> Class C1 consists of Allowed Claims equal to or less than $10,000. Class C1 Claims are estimated to be, in the aggregate, approximately $267,000, and are held by 104 claimants. Each holder of an Allowed Claim in Class C1 will be paid by the Reorganized District, in cash (from the Plan Fund), an amount equal to 75% of the amount of its Allowed Claim, without interest, within 30 days of the Effective Date, in full and final satisfaction of such claim. Any Class C2 creditor with a Claim exceeding $10,000 may elect to reduce its Claim to $10,000 and be treated as the holder of a Class C1 claim by giving written notice of his or her election to treat its Claim as a Class C1 Claim on the ballot provided for voting on the Plan. Class C1 is impaired.

5. <u>Class C2.</u> Class C2 consists of Allowed Claims in excess of $10,000. Class C2 claims are estimated to be, in the aggregate, approximately $2,910,000, and are held by 52 claimants. Unless the holder of a Class C2 claim elects treatment as a Class C1 creditor above, each holder of an Allowed Claim in Class C2 will paid by the Reorganized District, in cash (from the Plan Fund), an amount equal to 55% of the amount of its Allowed Claim, without interest, within 30 days of the Effective Date, in full and final satisfaction of such claim. Class C2 is impaired.

6. <u>Class C3.</u> Class C3 consists of the Simpson Claim. On or before the 30th calendar day following the Effective Date, the District shall pay to the holders of the Simpson Claim the amount of $153,074.68 in cash (from the Unsecured Creditors Plan Fund). The balance of the Simpson Claim (*i.e.*, $50,000) will be paid by the Reorganized District in twelve (12) equal monthly installments, without interest, of $4,166.66 beginning on the first day of the first full month following date the foregoing initial cash payment is made. For example, if the Effective Date of the Plan is July 15, 2009, and the initial cash payment of $153,074.68 is made on August 15, 2009, the first installment on the balance of the Simpson Claim shall be paid on September 1, 2009 (and on the first day of the following eleven months thereafter). Class C3 is impaired.

///

## 7. OBJECTIONS TO CLAIMS

The only claims which are subject to objection by the District are set forth in Exhibit D to the Disclosure Statement. All other claims filed against the District shall be deemed finally allowed and shall not be subject to reduction, offset, counterclaim, avoidance or any other objection following confirmation of the Plan. The allowed claims against the District are set forth in Exhibit E to the Disclosure Statement. The District acknowledges that the Simpson Claim is an Allowed Claim. The District further acknowledges and agrees that no objection to any of the claims listed on Exhibit D to the Disclosure Statement will be made on the grounds that such claim is untimely under the Government Claims Act (Section 905 of the California Government Code), *unless* the entire amount of such claim was not timely presented to the District as of the day immediately prior to the Petition Date of this Chapter 9 case (i.e., April 4, 2007, the day prior to the petition date of April 5, 2007). With the foregoing exception, all defenses and rights to the allowance of the claims identified on Exhibit D to the Disclosure Statement are reserved, respectively, by the District and the creditors holding such claims (including a creditor's ability to argue that the Government Claims Act does not apply to its claim).

## 8. VOTING

All persons or entities that have impaired Claims, if any, will be given the opportunity to vote on the Plan. In general, for the Plan to be confirmed, each class of claims which is impaired must vote to accept the Plan, taking into account only those claims which vote for or against the Plan. A class of claims has accepted the Plan, if at least two-thirds (2/3) in dollar amount and at least one-half (½) in number of the claims in that class which vote, accept the Plan. Under Section 1129(b), made applicable to Chapter 9 cases by section 901, if all classes which are Impaired do not accept the Plan, then for it to be confirmed, at least one (1) impaired class must accept it, if the Plan does not discriminate unfairly and is fair and equitable with respect to the non-accepting impaired class. Voting is, therefore, an important right of each creditor. Claimants are urged to seek legal advice regarding this Disclosure Statement, the Plan, and voting, as well as other matters regarding this case. Confirmation of the Plan also depends upon various rules contained in the Bankruptcy Code and Bankruptcy Rules.

## 9. EFFECT OF NON-CONFIRMATION OF PLAN

Unlike the more common Chapter 13 and Chapter 11 cases, a Chapter 9 case cannot be converted to a Chapter 7 liquidation case. If the Plan is not confirmed, then Debtor's counsel believes that only the following are possibilities:

1. The Debtor will be given a reasonable opportunity to propose and confirm an amended Plan; or

2. The case will be dismissed, in which case, the District and creditors would be put in the same position (to the extent possible) that they were in prior to the case being filed. If this case is dismissed, then numerous possibilities would exist. The Debtor might be able to negotiate separate arrangements with each of the creditors. There is no reason to believe that such negotiations would be successful. It also would result in an expensive, time consuming, and wasteful use of the District's very limited resources. The District might, instead, file a new Chapter 9 case and attempt to have a new Plan confirmed. It is anticipated that this, also, would not be a satisfactory resolution of failure to confirm a Plan in the existing case. It is also possible, but not likely, that if the case were dismissed, and the District was unable to reach an accommodation with its creditors, then the District could be dissolved under California State law by the Directors and voters of the District. On dissolution the assets would transferred to another local governmental entity which would required to "accept" the debts as well. The Debtor's counsel believes dissolution of the District is highly unlikely, because no other District is likely to choose to absorb the obligations in exchange for accepting the District's assets.

## 10. EFFECT OF THIS DISCLOSURE STATEMENT

As stated in the introduction, this Disclosure Statement is intended to give creditors, and parties in interest information to assist them in voting upon the Plan. However, the District and its officers, directors, attorneys, accountants, employees, and agents are not guarantors of the correctness of the opinion stated in this Disclosure Statement. The Bankruptcy Law and Rules are extremely complex and do not always give clear guidance for each situation. All creditors and parties in interest are, therefore, cautioned that they must rely upon their own investigation and

///

advice, and that the opinions contained in this Disclosure Statement, while presented in good faith, are not guaranteed.

Dated: April 30, 2009

                                         */s/ David J. Heaslett*
                                         David J. Heaslett
                                         Attorney for Debtor